IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| RIO VERDE PLANTAS, LLC, a Colorado limited liability company, | Case No. 3:25-cv-00098-JR |
| Plaintiff, | FINDINGS AND RECOMMENDATION |
| v. | |
| O&S HOLDINGS, LLC, a Missouri limited liability company, and TORY SCHWOPE, an individual, | |
| Defendants, | |
| and | |
| RIO VERDE HOLDINGS, LLC, an Oregon limited liability company, | |
| Nominal Defendant. | |

RUSSO, Magistrate Judge:

Plaintiff Rio Verde Plantas, LLC ("Plantas") moves for the appointment of a receiver pursuant to Fed. R. Civ. P. 66 to take possession, control, and management of nominal defendant Rio Verde Holdings, LLC's ("Holdings") business and assets. Oral argument was held on March 18, 2025. For the reasons set forth below, Plantas' motion is GRANTED.

Page 1 – FINDINGS AND RECOMMENDATION

## BACKGROUND

Holdings is a member-managed LLC, formed in Oregon in 2018 to operate as a wholesale nursery and growing operation. Edmundson Decl. ¶ 3 (doc. 22). Plantas and defendant O&S Holdings, LLC ("O&S") are co-equal owners of Holdings. *Id.* Matthew Edmundson is the sole Member and Manager of Plantas. *Id.* at ¶ 1. O&S, a Missouri LLC, is owned by two individuals, defendant Tory Schwope and Jerald O'Brien. Schwope Decl. ¶ 4 (doc. 26).

Edmundson also owns Green River, LLC ("Green River"), a Colorado limited liability company, and Edmundson, Inc., doing business as Arbor Valley Nursery ("Arbor Valley"), a Colorado corporation. Edmundson Decl. ¶ 2 (doc. 22). Green River leases land to Holdings under the terms of a commercial lease, and Arbor Valley purchases product from Holdings (and other nurseries) for wholesale and retail distribution. *Id*.

Shortly after Holdings was formed, Holdings and Green River jointly obtained a series of loans and lines of credit from American AgCredit, which, along with its subsidiaries (collectively known as "AAC"), offers loans and other financial services to agricultural and rural customers. Edmundson Decl. ¶ 5 (doc. 22); Bingham Decl. ¶ 2 (doc. 29). Holdings pledged numerous assets to AAC to secure the loans, including certain equipment, accounts receivable, and real estate. Edmundson Decl. ¶ 5 (doc. 22). Edmundson also personally guaranteed the AAC loans and cross-collateralized them via other Edmundson entities. *Id.*

Holdings' operating agreement designated Edmundson as the Managing Member of the LLC. Edmundson Decl. Ex. 1, at 2 (doc. 22-1). However, shortly after forming the company, Edmundson and Schwope agreed that DCA Outdoor, Inc ("DCA), a management company wholly owned by Schwope, would manage Holdings' day-to-day operations for an annual fee not to exceed $250,000. Schwope Decl. ¶ 5 (doc. 26); Edmundson Decl. ¶ 4 (doc. 33); Lehmann Decl. ¶

Page 2 – FINDINGS AND RECOMMENDATION

5 (doc. 36). The two parties agreed Edmundson would retain control over Holdings' finances and accounting. Edmundson Decl. ¶ 4 (doc. 33).

DCA's role was ultimately expanded to include daily finance and accounting management. *Id.* at ¶ 5. Edmundson consented to this change on the condition that he would retain his status as Manager and have final say over financial and accounting decisions. *Id.* He requested quarterly meetings with DCA's Chief Financial Officer to review Holdings' finances, but the meetings never happened. *Id.* at ¶ 6. Edmundson and Schwope quickly began to disagree about accounting practices, including the method for valuing Holdings' inventory. *Id.* at ¶¶ 8-11.

The relationship between the parties began to seriously deteriorate in 2022, when plaintiff alleges Schwope and O&S took complete control of Holdings and commenced a scheme to steal Holdings' assets for their personal benefit. Notice of Removal. Ex. 1, at 8 (doc. 1-1). That year, Edmundson was approached by WIPLFI, Holdings' tax accountant at the time, with concerns about Schwope and DCA's accounting. Edmundson Decl. ¶ 12 (doc. 33). WIPFLI noted significant discrepancies between the account receivables of Schwope's associated entities doing business with Holdings (the "Schwope Companies") and the payments Holdings received from the Schwope Companies. *Id.* According to WIPFLI, these discrepancies were disguised by suspicious journal entries in Holdings' QuickBooks, indicative of fraud. *Id.*

In February or March 2024, AAC expressed similar concerns about discrepancies in Holdings' financial reports, noting "continuing discrepancies in Holdings' books between (1) accounts receivable associated with Schwope Companies, and (2) payments received from Schwope Companies as well as portions of [accounts receivable] being wiped away completely with questionable journal entries." *Id.* at ¶ 14. AAC informed Holdings they would "no longer extend credit to Holdings against Schwope Company [accounts receivable]." *Id.* Additionally,

Page 3 – FINDINGS AND RECOMMENDATION

AAC required Holdings to commission a third-party audit of the company on June 15, 2023, with the report due by June 1, 2024. Edmundson Decl. Ex. 6, at 1 (doc. 22-6). Holdings failed to meet this due date, and AAC provided a one-time extension to September 1, 2024. *Id.*

By summer 2024, Edmundson attempted to use his status as Managing Member to obtain administrative access to Holdings' books to gain a better understanding of the company's financial situation, but Schwope and DCA refused his request. Edmundson Decl. ¶ 18 (doc. 33); Schwope Decl. ¶ 25 (doc. 26). According to Schwope, this information is "tightly controlled . . . to ensure the accuracy and integrity of the entity's data" and the "only reason someone would want administrative access outside of the normal course of business is to manipulate data." Schwope Decl. ¶ 25 (doc. 26).

Edmundson became so concerned with Holdings' financial situation that he directed Tim Beall and Amanda Lehmann, members of Arbor Valley's accounting personnel, to audit Holdings' financial records. Edmundson Decl. ¶ 15 (doc. 33). Beall and Lehmann reviewed Holdings' QuickBooks from 2021 to present. Beall Decl. ¶ 5 (doc. 35). They were denied full access by Schwope to the inventory management system, vendor or customer invoices, and accounting information from the Schwope Companies. *Id.* The information in their possession nonetheless indicated fraud was occurring and being disguised by DCA with improper accounting practices. *Id.* ¶¶ 6-7. Edmundson then disclosed their findings to AAC, discussing strategy with the lender on how to regain control of Holdings. Edmundson Decl. ¶ 17 (doc. 33).

Separately, in June 2024, Edmundson commissioned a third-party audit of Holdings through WIPFLI in an attempt to comply with AAC's requirement. Edmundson Decl. ¶ 16 (doc. 22). However, the auditors were unable to provide an opinion because they could not obtain sufficient audit evidence due to Holdings' accounting methods. Edmundson Decl. Ex. 9, at 1 (doc.

Page 4 – FINDINGS AND RECOMMENDATION

22-9). As a result, the auditors withdrew from their engagement with Holdings. Edmundson Decl. Ex. 10, at 1 (doc. 22-10).

In August 2024, Edmundson asked "DCA to step down from managing the daily operations of the Company" and requested that Schwope permit Holdings "to replace the DCA team with a different team of managing professionals. He refused," arguing such a change could sink Holdings during a time of financial instability. Edmundson Decl. ¶ 18 (doc. 33); Schwope Decl. ¶ 26 (doc. 26).

Holdings did not timely comply with AAC's third-party audit requirement, such that on October 16, 2024, AAC informed Holdings and Green River that they were in default on their loan. Bingham Decl. Ex. 24, at 2-3 (doc. 29-24). On December 4, 2024, AAC sent notice of ten further conditions of default. *Id.*

That same month, AAC requested that Edmundson install a Financial Advisor over Holdings. Edmundson Decl. ¶¶ 19-20 (doc. 33). Edmundson suggested instead pursuing the appointment of a receiver. *Id.* at ¶ 20. AAC acknowledged this suggestion without agreeing to or rejecting the proposal. *Id.*; Edmundson Decl. Ex. 7, at 1 (doc. 22-7).

Edmundson has used intercompany loans from his other entities since that time to cover Holdings' liabilities, including debt service payments on AAC loans and rent for the property Holdings leases from Green River. Edmundson Decl. ¶¶ 7, 11 (doc. 22).

Plantas initiated this action in Washington County Circuit Court on January 9, 2025. O&S then removed Plantas' claims to this Court on January 17, 2025. Plantas filed the present motion to appoint a receiver on February 7, 2025.

Page 5 – FINDINGS AND RECOMMENDATION

DCA filed for Chapter 11 Bankruptcy in the Western District of Missouri on February 10, 2025. *See generally* Buechler Decl. Ex. 1 (doc. 34). This filing coincided with the bankruptcies of 20 of Schwope's other entities. *Id.* at 5.

In the last week of February 2025, Edmundson, Beall, Lehmann, and others travelled to Oregon for a site visit at Holdings' facility. Beall Decl. ¶ 12 (doc. 35). They observed several irregularities, including Holdings' employees working on Schwope's property with Holdings' equipment and vehicles, and absent workers that were later determined to still be "on the clock." *Id.* at ¶¶ 13-14.

## STANDARDS

In diversity cases, federal law governs the appointment of receivers, even if state receivership law would produce a different result. *Sterling Sav. Bank v. Citadel Dev. Co.*, 656 F. Supp. 2d 1248, 1253 (D. Or. 2009) (citing *Canada Life Assurance Co. v. LaPeter*, 563 F.3d 837, 843 (9th Cir. 2009)). There is no "precise formula for determining when a receiver may be appointed," but the Ninth Circuit has provided a list of factors that may be considered:

> (1) whether the party seeking the appointment has a valid claim; (2) whether there is fraudulent conduct or the probability of fraudulent conduct, by the defendant; (3) whether the [business] is in imminent danger of being lost, concealed, injured, diminished in value, or squandered; (4) whether legal remedies are inadequate; (5) whether the harm to plaintiff by denial of the appointment would outweigh injury to the party opposing appointment; (6) the plaintiff's probable success in the action and the probability of irreparable injury to plaintiff's interest in the [business]; and (7) whether the plaintiff's interests sought to be protected will in fact be well-served by receivership.

*Canada Life,* 563 F.3d at 844-45 (citations omitted and cleaned up).

No single factor is dispositive, and while "appointing a receiver is an extraordinary equitable remedy, which should be applied with caution," the Ninth Circuit has granted district

courts "broad discretion in appointing a receiver . . . regardless of these factors." *Id*. (citation and quotations omitted).

The Ninth Circuit has not articulated an evidentiary standard for this factored test, but precedent from this District states: "The court must base its decision to appoint a receiver on the moving papers and such answers, affidavits in apposition, or counter-affidavits as may be offered, and also on the testimony of witnesses in open court if the court deems such a hearing advisable." *Sterling Sav. Bank*, 656 F. Supp. 2d at 1259 (citing *Santibanez v. Wier McMahon & Co.*, 105 F.3d 234, 242 (5th Cir.1997)).

**DISCUSSION**

**I.      Preliminary Matter**

AAC, a non-party to this suit, filed an opposition to Plantas' motion.[1] AAC argues: (1) Plantas fails to satisfy the *Canada Life* factors; (2) appointing a receiver would disregard its rights as a lender; and (3) Plantas improperly seeks unlimited power for the receiver. AAC's Resp. to Mot. Appt. Receiver 6-7, 13 (doc. 27). The Court briefly addresses AAC's second and third arguments before reaching the substantive merits of Plantas' motion.

The right of a secured creditor to the value of its collateral is a property right protected by the Fifth Amendment. *United States v. Ritchie Special Credit Invs., Ltd.*, 620 F.3d 824, 835 (8th Cir. 2010). However, the appointment of a receiver does not remove any party's right to possession of property, but places it in the custody of the court. *See, e.g.*, *Wiswall v. Sampson*, 55 U.S. 52, 66 (1852); *Nicholson v. Western Loan & Building Co.*, 60 F.2d 516, 518 (9th Cir. 1932). That is, a receiver is an officer of the court, appointed to take control, custody, and management of the

---

[1] AAC stated at oral argument they are appearing as an "interested party" and have no intention of formally intervening in this case. As Plantas denoted, federal law does not appear to contemplate a lender participating in this manner, in this context.

Page 7 – FINDINGS AND RECOMMENDATION

underlying assets for the purpose of preserving them for the benefit of all interested parties. 12 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure § 2981 (3d ed. 2024) (citing *Booth v. Clark*, 58 U.S. 322, 332 (1854)). The court, in turn, ensures that the appointment does not subject the secured interest to charges and expenses without the lender's approval. *Nicholson v. Western Loan & Building Co.*, 60 F.2d 516, 517-18 (9th Cir. 1932).

AAC's argument that a court-appointed receiver will disregard their secured interest in Holdings fails for several reasons. First, receivers are bound by the law to protect the financial interests of secured creditors. This receivership is intended to maintain the value of Holdings assets for all interested parties, including AAC. The receiver cannot be used to gain an advantage by Plantas: the receiver must work within the existing contractual provisions of Edmundson's lending agreements. Furthermore, there is no evidence that any of Edmundson's associated entities have filed for bankruptcy. On the contrary, Edmundson has used funds from these other entities to keep Holdings solvent. Edmundson Decl. ¶¶ 7, 11 (doc. 22). Finally, the receivership would not impose significant costs on Holdings' assets, as the court is responsible for ensuring the receivership does not subject AAC's secured interest to significant charges, and Edmundson has expressed a willingness to fund the receivership through Plantas capital. Edmundson Decl. ¶ 21 (doc. 33).

## II.    Receivership Analysis

Because appointing a receiver would not violate AAC's rights, the Court evaluates, in turn, the *Canada Life* factors.

### A.   Factor 1: Whether the Party Seeking Appointment has a Valid Claim

As noted above, Plantas alleges claims for fraud[2], conversion, and judicial dissolution related to O&S' alleged improper management and control of Holdings. In particular, plaintiff alleges widespread fraud beginning in 2022, when defendants "seized control of the management and operations of Holdings." Notice of Removal. Ex. 1, at 8 (doc. 1-1). Following this alleged seizure of power, defendants "engaged in a fraudulent scheme to enrich Defendants and Schwope Companies with Holdings' assets," misappropriating Holdings' inventory for their own purposes, making improper distributions of Holdings' cash to Schwope and the Schwope Companies, improperly allocating Schwope Company expenses to Holdings, and causing Holdings to pay fraudulent invoices submitted by the Schwope Companies. Edmundson Decl. ¶¶ 6, 12 (doc. 22).

The evidence Plantas relies on in support of these allegations is sufficient at this stage in the proceedings. Plantas' allegations are supported by Edmundson, Beall, and Lehman's statements, made under penalty of perjury, as well as the exhibits accompanying the declarations. Exhibit 8, which was the focus of Schwope's declaration and defendants' opposition at oral argument, was prepared by Beall and Lehmann to represent the alleged fraud they discovered in their 2024 investigation into Holdings' finances. Edmundson Decl. Ex. 8 (doc. 22-8); Beall Decl. ¶ 9 (doc. 35). The Court finds that Exhibit 8 to Edmundson's declaration, along with Exhibits 1

---

[2] To establish fraud under Oregon common law, the plaintiff must demonstrate: (1) "the defendant made a material misrepresentation that was false"; (2) "the defendant did so knowing that the representation was false"; (3) "the defendant intended the plaintiff to rely on the misrepresentation"; (4) "the plaintiff justifiably relied on the misrepresentation"; and (5) "the plaintiff was damaged as a result of that reliance." *Strawn v. Farmers Ins. Co. of Or.*, 350 Or. 336, 351–52, 258 P.3d 1199, *adh'd to on recons.*, 350 Or. 521, 256 P.3d 100 (2011), *cert. den.*, 565 U.S. 1177 (2012).

Page 9 – FINDINGS AND RECOMMENDATION

and 2 to Beall's declaration, corroborate at least some of Edmundson, Beall, and Lehmann's statements of perceived fraud and improper accounting methods.

Plaintiff's claim for judicial dissolution also has merit.[3] Plaintiff has raised a valid question of whether it is reasonably practicable to carry on Holdings' business in conformance with the articles of organization. The record shows Holdings is deadlocked between its two 50-50 members. Edmundson and Schwope cannot agree on accounting practices, have different visions for management, and could not collaborate long enough to allow a third-party auditor to properly audit the company, leading to default.

Courts have found such evidence sufficient to appoint a receiver. *See Peyton v. Grant,* 2024 WL 5264270, *9 (S.D. Fla. Dec. 31, 2024) (granting a motion to appoint a receiver pursuant to Fed. R. Civ. P. 66 where the parties set forth competing allegations of fraud and there was evidence of deadlock amongst the three shareholders). Because plaintiff has established valid claims and the record shows a clear deadlock between the members of Holdings, this factor weighs in favor of appointing a receiver.

### B.  Factor 2: Whether There is Fraud or the Probability of Fraud

As denoted above, the record reflects the probability of fraudulent conduct by defendants, such that this factor weighs in favor of appointing a receiver.

### C.  Factor 3: Whether the Property is in Imminent Danger of Being Lost, Concealed, Injured, Diminished in Value, or Squandered

Plantas has provided sufficient evidence of Holdings' fraught financial state to satisfy this factor. Holdings is in default on its AAC loans and has allegedly failed to pay rent to Green River

---

[3] Oregon law permits judicial dissolution of limited liability companies if "it is not reasonably practicable to carry on the business of the limited liability company in conformance with the articles of organization or any operating agreement." Or. Rev. Stat. § 63.661(b).

Page 10 – FINDINGS AND RECOMMENDATION

for six months, forcing Edmundson to maintain the lease using intercompany loans. Edmundson Decl. ¶ 11 (doc. 22). Separately, as discussed herein, DCA's management has put Holdings in financial risk.

Further, DCA and many of Schwope's associated entities have filed for Chapter 11 bankruptcy. Buechler Decl. Ex. 1 (doc. 34). This raises concerns about whether DCA's lack of capital will negatively affect its ability to manage Holdings going forward. Finally, the deadlock between Edmundson and Schwope has made management of the company impossible. The two members are not working together, and the property is at increased risk each day the deadlock continues.

For these reasons, the Court finds Holdings is in imminent danger of being lost, concealed, diminished in value, or squandered.

### D.     Factor 4: Whether Legal Remedies are Inadequate

While defendants have proposed maintaining the status quo in the hopes of Holdings' luck turning, the record fails to support this remedy. DCA filed for bankruptcy less than a month ago, and under its management Holdings has defaulted on loans, failed to pay rent, and been embroiled in litigation.

### E.     Factor 5: Whether the Harm to the Plaintiff by Denial of Appointment Outweighs Injury to the Opposing Parties

The harm to Plantas if Holdings fails is clear. Edmundson has personally guaranteed the loans that Holdings has defaulted on. Edmundson Decl. ¶ 5 (doc. 22). These loans are cross collateralized by Edmundson's other entities. *Id.* If Holdings fails and AAC exercises their default remedies, Edmundson will suffer severe financial harm.

Defendants argue a receiver would be detrimental to Holdings' operations and long-term viability, arguing that 2024 was on track to be a profitable year before the State of Oregon imposed

Page 11 – FINDINGS AND RECOMMENDATION

a quarantine on the farm due to the discovery of a soilborne plant pathogen. Defs.' Resp. to Mot. Appt. Receiver 10-11 (doc. 25). However, the record shows DCA has failed to effectively manage Holdings, and it appears unlikely its removal would subject defendant to significant injury. Schwope has not personally guaranteed any of the loans and stands to lose significantly less than Edmundson if Holdings fails. The damage Plantas would incur from denial is thus greater than the injury defendants would suffer from the appointment of a receiver.

### F.     Factor 6: Probability of Success in the Action and the Possibility of Irreparable Injury to the Proponent's Interest in the Property

This motion precedes any judgment on the merits, so the Court cannot accurately judge the probability of success. Although Plantas has produced evidence of the potential for irreparable injury to their interest in Holdings, the Court finds this factor to be neutral.

### G.     Factor 7: Whether the Proponent's Interest Will be Well-Served by a Receivership

Both parties' interest in the value of Holdings itself, were the company to be judicially dissolved at the end of this litigation, would be well-served by receivership. The evidence indicates that Holdings is indeed failing under DCA's management, that O&S may have diminished the value of the company through fraud, and that the two parties are deadlocked and incapable of working together to run the company. This indicates Plantas' interests will be best served by the appointment of a neutral third party to manage Holdings during the pendency of this litigation. Therefore, on balance, the *Canada Life* factors weigh in favor of a receivership.

## III.    Receiver Qualifications

Defendants question the qualifications of Plantas' proposed receiver, High Plateau Asset Management ("High Plateau"), and its CEO, Gene Buccola. Defs.' Resp. to Mot. Appt. Receiver 23-24 (doc. 25). However, there can be no dispute that Buccola has significant experience acting

as a receiver and managing large assets. Buccola Decl. Ex. 1, at 2 (doc. 32). He and his team have provided a comprehensive strategy for preserving the value of Holdings' assets. Buccola Decl. Ex. 3 (doc. 32). The Court finds Buccola and High Plateau competent and experienced, and thus qualified to act as a neutral receiver during the pendency of this litigation.

## RECOMMENDATION

For these reasons, Plantas' motion to appoint a receiver (doc. 20) should be GRANTED.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order. The parties shall have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections with the court. Thereafter, the parties shall have fourteen (14) days within which to file a response to the objections. Failure to timely file objections to any factual determination of the Magistrate Judge will be considered as a waiver of a party's right to de novo consideration of the factual issues and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to this recommendation.

DATED this 21st day of March, 2025.

        /s/ Jolie A. Russo
Jolie A. Russo
United States Magistrate Judge